<u>**AFFIDAVIT IN SUPPORT OF
SEIZURE WARRANT APPLICATION**</u>          2:26mj92 CMR

I, Bret Curtis, Special Agent, Federal Bureau of Investigation ("FBI"), being duly sworn, declare and state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for the issuance of a seizure warrant to seize all cryptocurrency and assets (TARGET ASSETS) in the Crypto.com account for User Identification Number 21108819 held in the name of Parrishia Shelton-Warren (TARGET ACCOUNT).

2. The TARGET ASSETS are believed to constitute or be derived from proceeds traceable to Wire Fraud (18 U.S.C. § 1343) and property involved in Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)). For the court to authorize seizure of the TARGET ASSETS, it must find probable cause to believe that: (1) the crimes of Wire Fraud and/or Concealment Money Laundering were committed; and (2) the TARGET ASSETS have a connection to those offenses in the manner specified by the below statutes authorizing forfeiture.

3. For the reasons set forth below, there is probable cause to believe the TARGET ASSETS are subject to civil seizure and forfeiture as follows:

   a. Pursuant to 18 U.S.C. § 981(a)(1)(C) because the TARGET ASSETS are property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (Wire Fraud). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. A "specified unlawful activity," as defined in § 1956(c)(7), includes offenses listed in 18 U.S.C. § 1961(1). Section 1961(1) includes violations of 18 U.S.C. § 1343.

    b. Pursuant to 18 U.S.C. § 981(a)(1)(A) because the TARGET ASSETS were involved in Concealment Money Laundering or are traceable to such property.

    c. Consequently, seizure of the TARGET ASSETS for civil forfeiture is authorized by 18 U.S.C. § 981(b).

4. For the reasons set forth below, there is probable cause to believe the TARGET ASSETS are subject to criminal seizure and forfeiture as follows:

    a. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because the TARGET ASSETS are property, real or personal, which constitutes or are derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (Wire Fraud).

    b. Pursuant to 18 U.S.C. § 982(a)(1) because the TARGET ASSETS were involved in Concealment Money Laundering or are traceable to such property.

    c. Consequently, seizure of the TARGET ASSETS for criminal forfeiture is authorized by 21 U.S.C. § 853(f) and 18 U.S.C. § 982(b).

5. With respect to seizure for criminal forfeiture, 21 U.S.C. § 853(f) provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture." There is a substantial risk that the assets discussed in this affidavit will be withdrawn, moved, dissipated, or otherwise become unavailable for forfeiture unless immediate steps are taken to secure them through a seizure warrant. As cryptocurrency, the TARGET ASSETS are inherently portable and fungible and can easily be transferred or withdrawn just like funds in a bank account. I therefore submit that a protective order under 21 U.S.C. § 853(e) would not be sufficient to assure that the assets will remain available for forfeiture and ask the Court to so find in authorizing the seizure warrant.

6. Although Rule 41(b) of the Federal Rules of Criminal Procedure provides that seizure warrants must be executed in the issuing district, other statutes authorize a magistrate to issue a warrant to seize property outside the district. Under 21 U.S.C. § 853(l), district courts have jurisdiction to authorize a criminal seizure warrant under 21 U.S.C. § 853(f) "without regard to the location of any property which may be subject to forfeiture." Similar authority is granted by 18 U.S.C. § 981(b)(3) for civil forfeiture seizure warrants under 18 U.S.C. § 981(a):

> Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement.

Under 28 U.S.C. § 1355(b), a forfeiture action may proceed in a district "in which any of the acts or omissions giving rise to the forfeiture occurred." As described below, the victim is a Utah resident and acts giving rise to the forfeiture occurred in this district. Crypto.com's headquarters is in Tyler, Texas, which is located in the Eastern District of Texas.

### BACKGROUND OF AFFIANT

7. I am a Special Agent with the FBI in Salt Lake City, Utah. I have been an FBI Special Agent since February 22, 2004. In my capacity as a Special Agent with the FBI, I have conducted and participated in numerous official investigations into mail and wire fraud, money laundering and other financial and computer crimes as well as drug trafficking crimes. I am a graduate of the FBI Training Academy in Quantico, Virginia and have also attended advanced training classes in the areas of white-collar crime.

8. As an FBI Special Agent, I am familiar with the use of financial accounts by those who operate fraudulent schemes and the types of transactions reflected on financial account records. I am also familiar with the principles of tracing assets into and through financial accounts.

9. The facts set forth in this affidavit are based on my personal observations, my training and experience, my review of documents, and interviews with witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested seizure warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

**BACKGROUND ON CRYPTOCURRENCY**

6. Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat (i.e. national currencies like the dollar, euro, yen, etc.) currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[1] Cryptocurrency is not illegal in the United States.

---

[1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

b. Bitcoin[2] ("BTC") is a type of cryptocurrency. Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by "mining." An individual can "mine" bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it's not completely anonymous, bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

c. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long. Each public address is

---

[2] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the cryptocurrency. That practice is adopted here.

controlled and/or accessed using a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

d.  Although cryptocurrencies such as bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services on hidden services websites. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transfers, trades, purchases, and other financial transactions. As of October 31, 2024, one bitcoin is worth approximately $72,335.05 though the value of bitcoin is generally much more volatile than that of fiat currencies.

e.  Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code[3] with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know

---

[3] A QR code is a matrix barcode that is a machine-readable optical label.

that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured if their assets become potentially vulnerable to seizure and/or unauthorized transfer.

   f.  Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars. According to Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[4] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers stealth and anonymity. These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1–2%).

   g.  Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application;

---

[4] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-persons-administering.

however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

## RELEVANT CRIMINAL STATUTES

7. Title 18 U.S.C. § 1343 states:

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures . . . for the purpose of executing such scheme or artifice.

8. Title 18 U.S.C. § 1956(a)(1)(B)(i) states:

   Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

   (B) knowing that the transaction is designed in whole or in part—

       (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

## FACTS

10. This case involves the receipt of funds into the TARGET ACCOUNT consisting of proceeds from what is commonly known as an impersonation scheme. This is where a bad actor

impersonates a government official or employee of a legitimate company to persuade a victim to pay a fine, provide account access or solicit passwords, codes, or personally identifiable information to gain access to assets held by the victim.

11. The victim, age 69, resides in Sandy, Utah and fell victim to an impersonation scam in which he believed he was sending money to cryptocurrency wallets to pay a fine for failing to appear to a jury summons.

12. Specifically, on December 17, 2025, at about 2:30 PM, the victim received a call from an unknown number. The caller claimed to be a police officer from the Salt Lake County Sheriff's Department (SLC). Between December 17 and December 18, 2025, the victim talked to multiple people claiming to work for SLC. SLC told the victim he had been indicted for failure to appear in a jury summons. SLC sent the victim, via a text message from (385)800-0272, a copy of a warrant for his arrest and a gag order ordering the victim to not talk to anyone about the case.



13. SLC told the victim because he did not have a criminal history, he could avoid detention by paying $15,000 as bail to avoid incarceration. SLC told the victim he had to pay bail immediately or he would be arrested. SLC directed the victim to pay the bail in cryptocurrency. SLC provided the following documents to the victim related to paying bail to dismiss the warrant:



14.     The victim told SLC he only had $3,242. On December 17, 2025, SLC directed the victim to the crypto ATM at the Halal Market at 2407 S. Redwood Road, West Valley City, Utah to send the first payment. Below is the QR code SLC directed the victim to send the first payment to. The victim sent $3,242 to this wallet on December 17, 2025, at 3:45 PM:



15.     After sending the first payment, the victim transferred $15,000 from his Charles Schwab account to his Zions Bank account. He told SLC he could not withdraw the money from his Zions account until the next day. SLC told the victim he would have to stay on the phone until the full $15,000 bail was paid. The victim went home, but was directed to keep his phone on, and the call with SLC active, the entire night. The next morning, SLC was still on the line. The victim confirmed that the $15,000 was transferred from his Charles Schwab account to his Zions Bank account. The victim withdrew $15,000 cash from his Zions Bank account and used the money to send more bail payments.

16.     The victim went back to the Halal Market to deposit the cash into the crypto ATM. The victim made this deposit (the second deposit of $7,500) on December 18, 2025, at 9:50 AM to the wallet associated with the QR code below:



17.     The victim made another deposit of $7,500. The third deposit was made to the wallet associated with the below QR Code on December 18, 2025, at 12:11 PM.



18.     SLC told the victim they did not receive the first two payments. The victim borrowed $5,000 from his brother. The victim made the fourth, and final deposit of $5,000 to the wallet associated to the below QR code on December 18, 2025, at 2:23 PM.



19.     In total, the victim sent $23,242 in cryptocurrency in furtherance of the scam.

20.     Throughout the ordeal, SLC insisted the victim stay on the phone. SLC told the victim he would be arrested if he hung up or disobeyed any of their instructions. The victim failed to realize it was a scam in part because of the stress SLC created and because he was deprived of sleep.

21.     The victim's family intervened on December 18, 2025, after the victim borrowed $5,000 from his brother. The victim's family called the FBI and put the victim on the phone with me. I told the victim it was a scam, and the victim agreed to disconnect his call with SLC.

22.     An FBI Forensic Accountant tracked the movement of the victim's funds on the Bitcoin blockchain, an open, distributed ledger that records transactions of BTC between two parties efficiently and in a verifiable and permanent way. Blockchain analysis showed that

money deposited by the victim into a BitcoinDepot ATM was received by an account at Crypto.com, a cryptocurrency exchange.

23. On December 18, 2025, the victim sent funds to four different BTC addresses provided by scammers via a BitcoinDepot ATM. All four of those cryptocurrency addresses sent the funds to a single intermediary address, which then sent funds to a deposit address at Crypto.com. All of these transfers occurred on December 18, 2025.



24. On February 9, 2026, Crypto.com provided records for the account identified as having received funds from the victim's deposits via BitcoinDepot. The TARGET ACCOUNT received 0.14264781 in BTC from the victim's deposits, equivalent to approximately $12,096.84 at the time of the transactions. Crypto.com records showed that the BTC balance in the TARGET ACCOUNT as of February 9, 2026, was 0.26506331, equivalent to approximately $20,851.93.

25. On February 9, 2026, I called Parrishia Shelton-Warren on phone number ending in 4834 with area code 718 (a New York City area code). Shelton-Warren acknowledged that her Crypto.com account, the TARGET ACCOUNT, was frozen with around $20,000 worth of

crypto-currency in it. Shelton-Warren said someone hacked into the TARGET ACCOUNT during the winter of 2025, and she lost control of the wallet.

26. At first, Shelton-Warren claimed that some of the money in the wallet was hers. I then explained to Shelton-Warren that the victim in Utah was directed to transfer more than $12,000 into the TARGET ACCOUNT and that those funds have remained in the account since the account was frozen. Shelton-Warren said she had nothing to do with that victim, or anyone else in Utah. Shelton-Warren further suggested that none of the cryptocurrency in the wallet belonged to her and it should be returned to whoever it belonged to because it did not belong to her. The writer reminded Shelton-Warren that there was approximately $20,851.93 worth of cryptocurrency in the TARGET ACCOUNT at the time it was frozen. Shelton-Warren said none of that money was hers. Shelton-Warren said the TARGET ACCOUNT was hacked and suggested the TARGET ACCOUNT be closed and all of the money left in the TARGET ACCOUNT be returned to whoever the money came from because it did not belong to her.

## CONCLUSION

27. Based on the transfer of the victim's funds from an initial wallet through a series of four transactions occurring the same day, there is probable cause to believe that all currencies in the TARGET ACCOUNT are either proceeds of wire fraud or property involved in concealment money laundering. Accordingly, the TARGET ASSETS are subject to forfeiture under the authorities described above.

I swear, under penalty of perjury, that the foregoing is true and correct.

*[signature: Bret Curtis]*

Bret Curtis, Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me telephonically this 10th of February, 2026

*[signature: Cecilia M. Romero]*

Cecilia M. Romero
Chief United States Magistrate Judge